# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

TONY RAY KING,                          )
                                        )
                Plaintiff,              )
                                        )
        v.                              )        No. 4:17-CV-742 CAS
                                        )
GEORGE LOMBARDI, et al.,                )
                                        )
                Defendants.             )

## MEMORANDUM AND ORDER

This matter is before the Court on defendants Dave Dormire, Terry Russell, Troy Steele, and

Dale Phillips's motion for summary judgment. Also before the Court is defendant Terry Taylor's

motion for summary judgment.[1] Plaintiff filed memoranda opposing the motions, to which

defendants replied. The motions are fully briefed and ripe for review. For the following reasons,

the Court grants defendants' motions for summary judgment.

### I. Background

Plaintiff Tony Ray King is a prisoner residing at the Eastern Reception Diagnostic and

Correctional Center ("ERDCC") in Bonne Terre, Missouri. Plaintiff murdered his young son, and

while awaiting sentencing, he murdered his cellmate. In his First Amended Complaint, plaintiff

brings claims against Dave Dormire, the Director of Adult Institutions for the Missouri Department

of Corrections ("MDOC"); Dale Phillips, a Functional Unit Manager at ERDCC, Terry Russell,

warden of ERDCC until February or March 2015; Troy Steele, warden at ERDCC since February

---

[1]These are the only remaining defendants in the case. All other defendants were dismissed
on the Court's initial review, pursuant to 28 U.S.C. § 1915(e). See Memorandum and Order dated
May 25, 2017. (Doc. 9).

or March 2015; and Terry Taylor, a nurse for Corizon, LLC, who worked at ERDCC. All defendants are sued in their individual and official capacities.

Plaintiff alleges that he was held in administrative segregation at ERDCC for 923 consecutive days, from November 5, 2013 to May 16, 2016, the majority of which, from November 5, 2013 until December 30, 2015, he was in single-cell confinement. During his time in administrative confinement, he alleges that he was deprived of privileges allowed to prisoners in the general population, such as attending religious services, recreational opportunities, canteen access, contact visits, and he was allowed only one fifteen-minute phone call per month. Plaintiff also alleges that he was denied adequate hygiene supplies and medical supplies for his dry, cracked, and bleeding skin and for a ringworm rash. He further alleges that he experienced a worsening of his anxiety disorder as a result of being held in prolonged administrative segregation.

Plaintiff brings two counts in his First Amended Complaint pursuant to 42 U.S.C. § 1983: (1) deprivation of due process rights guaranteed by the United States Constitution, against defendants Dormire, Russell, and Steele (Count I); and (2) deprivation of the constitutional right to be free of cruel and unusual punishment, against defendants Phillips and Taylor (Count II). For relief, plaintiff seeks a declaration that defendants violated his constitutional rights, compensatory damages, and punitive damages.

In response to the First Amended Complaint, defendants Dormire, Russell, Steele, and Phillips filed motions to dismiss, which were denied. After conducting discovery, defendants Dormire, Russell, Steele, and Phillips now move for summary judgment on two grounds. Defendants Dormire, Russell, and Steele argue that in light of the fact plaintiff murdered his cellmate, it was reasonable and lawful to house him in single-cell administrative segregation. They argue he received

constitutional due process during his assignment in administrative segregation. Defendant Phillips argues the deprivation of skin lotion does not amount to constitutionally prohibited cruel and unusual punishment. Defendants Dormire, Russell, Steele and Phillips also argue that they are entitled to qualified immunity. Defendant Taylor also moves for summary judgment arguing that plaintiff's dry skin was not a serious medical condition. Defendant Taylor further argues that he did not disregard any medical condition, and to the extent he delayed in treating plaintiff's ringworm, it had no detrimental effect.[2]

## II.  Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts.  AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(c).

---

[2]In his reply memorandum, defendant Taylor raises for the first time the issue that plaintiff failed to exhaust his administrative remedies.  As this issue was not raised in his initial briefing, and the Court already addressed the exhaustion issue in a Memorandum and Order dated December 12, 2017, denying the other defendants' motion to dismiss, the Court declines to address the issue now. In any event, the exhaustion issue is moot, as the Court finds plaintiff has failed to establish that defendant Taylor violated his constitutional right to be free from cruel and unusual punishment.

Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 257; Heisler v. Metropolitan Council, 339 F.3d 622, 626 (8th Cir. 2003). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### III. Facts

After reviewing the record, and with the summary judgment standard in mind, the Court accepts the following facts as true for purposes of resolving defendants' motions for summary judgment:

#### A. Administrative Segregation

On May 2, 2013, plaintiff was convicted of murdering his seven-year-old son by manual strangulation. While awaiting sentencing for the murder of his son, plaintiff was confined with another cell-mate in the Buchanan County Jail. On June 11, 2013, while confined in the Buchanan County Jail, plaintiff murdered his cellmate, also by manual strangulation.

On September 17, 2013, plaintiff was transferred to ERDCC. On an initial classification form dated the same day, it was noted the ERDCC Classification Committee recommended that plaintiff was to be assigned to the general population at ERDCC – a recommendation that was approved. Doc. 64, Ex. 9 at 1.

Plaintiff entered a guilty plea for the murder of his cellmate on September 26, 2013. He was transferred back to Buchanan County sometime thereafter for sentencing. Upon his return to ERDCC on November 4, 2013, plaintiff was placed in single-cell administrative segregation "pending review by mental health staff." Doc. 62, Ex. D. It was noted on a Temporary Administration Segregation Confinement Form dated November 4, 2013, that plaintiff was "an immediate security risk" and, therefore, "[t]here is an urgent need to separate the offender from others for his/her own safety or that of others" and "[f]or the security and good order of the institution." Id.

On November 6, 2013, a prison psychiatrist, Dr. Anna Irving, M.D., conducted an examination of plaintiff and determined that he was not, at that time, mentally disabled or hostile. On November 13, 2013, following a hearing at which plaintiff was present, the Classification Committee at ERDCC recommended that plaintiff remain in single-cell confinement in the prison's administrative segregation unit, "pending review by mental health staff – special security concerns." Doc. 62, Ex. H. Plaintiff refused to sign the Classification Hearing Form. Doc. 64, Ex. 9 at 2.

While an inmate in administrative segregation, plaintiff was monitored by the mental health staff at ERDCC at least every ninety (90) days. On November 25, 2013, plaintiff was assessed by Diane Kearns, LPC, the Institutional Chief of Mental Health Services.[3] In an email dated November 25, 2013, to defendant Russell, and a number of others, Ms. Kearns wrote that "the mental health treatment team recommends that Offender King remained [sic] single cell, based on his history of violent behaviors, to ensure safety and security at ERDCC." Doc. 62, Ex. I. Ms. Kearns wrote,

---

[3]In his response to defendants' Statement of Uncontroverted Material Facts, plaintiff disputes that he was assessed by Ms. Kearns. Plaintiff, however, fails to support this objection with any citation to evidence in the record. As a result, the Court accepts defendants' fact as true.

"Although Offender King currently presents as stable, he has a history of impulsive behavior and mood swings. In addition, he has reportedly made statements to staff since his arrival at this facility that he has killed more than once and that he is not finished killing yet."[4] Id.

The next classification hearing was held on December 11, 2013, at which plaintiff was present. On the Classification Hearing Form dated the same day, it was written that plaintiff was "currently being reviewed for long term single man cell placement at request of mental health staff." Doc. 61, Ex. 9 at 3.

On January 21, 2014, Dwayne Kempker, the Deputy Division Director for the Missouri Division of Adult Institutions, approved long-term single-cell status for plaintiff. Mr. Kempker wrote in an email to Chrystal Schmitz, Central Transfer Authority Manager for MDOC, "Per the Buchanan County event, I do approve a single cell status until further notice. He was charged with murdering his cellmate there. . . . I do order his single cell status. He may remain at ERDCC unless other necessitating factors arise." Doc. 62, Ex. K.

On March 5, 2014, the ERDCC Classification Committee held a 90-day classification review hearing, at which plaintiff was present. Plaintiff declined to make a statement at the hearing. The Classification Hearing Form for the March 5, 2014 hearing includes a notation that plaintiff was in

---

[4]Citing Jenkins v. Winter, 540 F.3d 742, 748 (8th Cir. 2008), and Ward v. International Paper Co., 509 F.3d 457, 462 (8th Cir. 2007), plaintiff argues that the statements in Ms. Kearns's email are inadmissable double hearsay and cannot be used to support defendants' motion for summary judgment. The Court finds, however, that the statements are not hearsay in that they are not being offered for the truth of the matter asserted, i.e., that plaintiff made such statements, but rather to show a decision-maker's state of mind. See Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); Fed. R. Evid. 803(3) ("[a] statement of the declarant's then existing state of mind … such as intent, plan, motive, design, mental feeling" is not hearsay).

"single cell status approved – long term, continuously reviewed by mental health staff." Doc. 64, Ex. 9 at 4.

On March 7, 2014, plaintiff submitted an Informal Resolution Request ("IRR") challenging his assignment to administrative segregation. On March 27, 2014, the staff at ERDCC denied the IRR and informed plaintiff as follows: "Your mandated single cell assignment is for safety and security concerns and was approved by a Deputy Director of Adult Institutions of the Department of Corrections. This decision will be re-evaluated occasionally. A recommendation will be made and submitted at the time of review." Doc. 62, Ex. M.

On May 27, 2014, the Classification Committee at ERDCC held a 90-day classification review hearing, a which plaintiff was present. Doc. 64, Ex. 9 at 5. Plaintiff declined to make a statement. The Classification Hearing Form dated that day noted that plaintiff should continue to remain in single-cell status and be monitored by mental health staff. Id.

After his IRR was denied, plaintiff submitted an Offender Grievance on March 25, 2014, and a Grievance Appeal on May 12, 2014, both of which were denied. On June 5, 2014, Alan Butterworth, Functional Unit Manager at ERDCC, wrote to a letter to plaintiff in response to correspondence plaintiff sent to defendant Russell. Mr. Butterworth wrote: "You have been assigned to single cell status at the approval of the Deputy Division Director, with a review date in approx. one year. This recommendation is based on the totality of your circumstances, as well as evaluations from medical, mental health, and classification staff." Doc. 62, Ex. O.

On June 23, 2014, Dwayne Kempker, Deputy Division Director, wrote an appeal response in which he informed plaintiff:

> Your single cell status was initiated due to your murder of your cellmate at Buchanan County Jail. Even though the event in question occurred outside of the Department,

> it is the responsibility of the Department to ensure the safety of the offenders housed within, which includes separating those offenders who can be considered a potential risk to other offenders. Your single cell status will be periodically reevaluated, to determine if it needs to be continued.

Doc. 62, Ex. P. Mr. Kempker denied plaintiff's request that he be placed in the general population.

The next classification review hearing was held on August 20, 2014, at which plaintiff declined to participate. Doc. 62, Ex. Q at 1. The Classification Hearing Form dated that day noted "single cell status of [sic] approved from Div. Director for continued mental health observation." Id.

A classification review hearing was held on November 10, 2014, at which plaintiff was present. Plaintiff told the committee that he "want[ed] out!" Doc. 62, Ex. Q at 2. At this hearing, the Administrative Segregation Committee recommended continued placement in administrative segregation. The Classification Hearing Form for the November 10, 2014 hearing states, "single cell mandated per director." Id.

On November 12, 2014, ERDCC Corrections Case Manager Diane Montgomery submitted a memorandum to defendant Russell in connection with the one-year review of plaintiff's placement in single-cell administrative segregation. In her November 12, 2014 memorandum, Montgomery wrote:

> Offender King is a 30 year old male who initially arrived within the MoDoc 07/16/2013 to serve a life sentence for Murder 1st Degree. He also has convictions for Murder 2nd degree, Arson, and Abuse of a Child. File material indicates he caused the death of his 7 year old son by means of manual strangulation and then setting fire to the trailer they resided in. While incarcerated in the Buchanan County jail, King killed his cell mate, stating he did so in order to compare the two autopsy reports, proving his innocence in the murder of his son. He was assigned to Administrative Segregation Single Cell on 10/13/2013 per mental health request due to his history of violence. [H]e has remained on single cell status in the ERDCC adseg unit since assignment.

King has an education score of 1 a vocational score of 3 and a mental health score of 3. A qualified Mental Health Professional has evaluated his mental health status and indicates that continued segregation is not contraindicated at this time.

Since arrival in the MoDOC, King has incurred no conduct violations and has exhibited acceptable institutional adjustment. It is suggested he be released from single cell status in order to re-integrate him to two man cell in anticipation of eventual general population assignment.

Doc. 62, Ex. Q at 3.

Defendant Russell did not follow Montgomery's recommendation to release plaintiff from single-cell administrative segregation, and instead recommended continued single cell assignment. Id. On November 20, 2014, Deputy Division Director Dwayne Kempker signed off on defendant Russell's recommendation to extend plaintiff's placement in single-cell administrative confinement.

Plaintiff's next classification hearing was held on December 10, 2014, at which plaintiff refused to make a statement. On the Classification Hearing Form dated this date, it is written "remains in Ad Seg per Division Director Dormire" and "mandated single cell status per Director." Doc. 62, Ex. Q at 4.

Additional classification hearings were held on March 6, May 28, August 20, and November 12, 2015. On the Classification Hearing Forms for these four hearings, it was written that plaintiff's placement in single-cell administrative segregation was "mandated" by Division Director Dormire. Doc. 64, Ex. 9. The committee recommended continued single-cell administrative segregation following all four hearings. Plaintiff refused to participate in the March 6, May 28, and August 20, 2015 hearings. At the November 12 hearing, plaintiff inquired whether he had been put in for a transfer.

On November 3, 2015, defendant Steele's assistant, Karen Black, submitted a request that plaintiff be placed in the Potosi Reintegration Unit. On December 29, 2015, Cindy Griffith, the

Warden at Potosi Correctional Center, responded by email in which she wrote that plaintiff did not appear to meet the Potosi Reintegration Unit's criteria, "as he has only received one minor contraband violation for his entire two and a half years of his segregation assigned." Doc. 64, Ex. 17 at 2. She also wrote that past murder sentences are normally not part of the admission criteria. Id. Mr. Kemper responded to Ms. Griffith and copied Troy Steele, writing, "[plaintiff] shall remain at ERDCC segregation status, however, the long term single cell order is lifted. He should be acclimated to a two man cell (compatibility required) and seg release to [General Population] planning should commence. His integration into GP should be coordinated within the next 120 to 180 days." Id. at 1. On December 30, 2015, plaintiff was released from single cell confinement and placed in a double cell in administrative segregation.

The Classification Hearing Form for plaintiff's February 4, 2016 classification hearing states: "[Plaintiff] remains in adseg per Division Director Dormire. [Plaintiff] is no longer mandated to single cell status. Per Director Dormire 12-29-15 [plaintiff] may double cell and after 120-180 days may be reviewed for release to GP." Doc. 64, Ex. 9 at 13. At a classification hearing held on April 28, 2016, it was recommended that plaintiff be released to the general population at ERDCC. On the Classification Hearing Form dated that date it is written, "[Plaintiff] has 120 days in Adseg double cell as directed. Only violation is 24.1 10-25-15. [Plaintiff] has had good behavior and is acceptable for GP." Id. at 14. On May 16, 2016, plaintiff was placed in general population at ERDCC. Plaintiff was held in administrative segregation for 923 days, 783 of which he was in single-cell confinement.

Defendant Dormire worked as MDOC's Director of Adult Institutions from September 2011 until March 2017. As Director of Adult Institutions, defendant Dormire was responsible for

ensuring that MDOC's administrative segregation policies were followed.  Pursuant to MDOC policy, defendant Dormire also reviewed decisions to keep offenders in single-cell confinement.

Defendant Russell worked as the Warden at ERDCC from 2010 until his retirement in early 2015. Defendant Steele succeeded defendant Russell as Warden at ERDCC and remained in that position until June 1, 2018.  The ERDCC Warden was the highest-ranking administrative officer at the facility, and was responsible for the management of ERDCC staff and inmates. During the periods of time that they served at ERDCC, defendants Warden, Russell, and Steele were part of the chain of command for decisions on whether to release an inmate from administrative segregation.

Defendants Dormire and Steele testified that an inmate who has murdered a fellow cell-mate while incarcerated is generally placed in single-cell administrative segregation for three to five years, and sometimes longer.  According to defendants Dormire and Steele, plaintiff was held in single-cell administrative segregation because he had murdered another cellmate.  Defendant Dormire testified that based on plaintiff's past criminal history, he was a risk to harm and kill other cellmates.  He also testified that he was concerned because there were notations that plaintiff refused to participate in many of the review hearings.  Doc. 62, Ex. G at 7.   Plaintiff testified that he understood some of the staff at ERDCC considered him to be a threat to other offenders being housed at ERDCC.

### B.   Access to Hygiene Products and Medical Services

ERDCC's Administrative Segregation Regulations placed restrictions on inmates' attire, access to hygiene products, canteen access, personal property, telephone usage, and recreation that did not apply to inmates in general population.  Unlike inmates in general population, inmates in

administrative segregation were not allowed to purchase skin care products from the canteen and could only obtain these products from the facility's medical staff.

Plaintiff made his first Health Service Request ("HSR") regarding dry skin on May 19, 2015. Plaintiff specifically requested hydrocortisone cream to treat his dry skin. Plaintiff's chief complaint was itchy skin, and the nurse noted some minimal redness. On June 10, 2015, the plaintiff informed Nurse Anna Wideman, who is not a defendant in this suit, that his skin had been dry for the previous 20 months. Nurse Wideman gave plaintiff 1% hydrocortisone cream to apply to the affected area.

Plaintiff did not file another HSR for dry skin until January 19, 2016. Defendant Terry Taylor, a nurse who treated inmates in administrative segregation, testified during an examination of January 20, 2016, he observed that King "had dry skin on his hands and legs," with "scattered pinholes" from scratching. Doc. 70, Ex. D. Defendant Taylor did not note any redness, swelling, bleeding, or drainage. Plaintiff testified that at this appointment his skin was cracking open and bleeding. Defendant Taylor examined plaintiff's skin, and instructed plaintiff to refrain from showering more than once a day and to use soap on the axilla and inguinal areas only. He also instructed plaintiff to avoid hot showers and to increase his intake of water.

On February 4, 2016, plaintiff submitted an IRR in which he stated that he "had dry skin so bad that it was cracking and bleeding," and requested that he "be given something for my dry skin." Doc. 40, Ex. E. Plaintiff's chief complaint in his IRR was that defendant Taylor denied him medical treatment for his dry skin.

On February 7, 2016, plaintiff filed a HSR for dry skin. Triple antibiotic ointment was issued to plaintiff in response to his HSR. On February 9, 2016, plaintiff had another encounter with Nurse Taylor. Plaintiff complained of dry skin on his hands and wanted to receive lotion. Nurse

Taylor did not provide plaintiff with any lotion but instead instructed him to shower once per day, use soap on the axilla and inguinal areas only, and drink more water. Nurse Taylor provided plaintiff with two packs of triple antibiotic ointment.

Plaintiff filed an HSR on February 20, 2016, requesting more triple antibiotic ointment for his dry skin. Nurse Taylor saw plaintiff on February 25, 2016, and provided him with two packs of bacitracin ointment.

On March 10, 2016, plaintiff submitted a HSR in which he indicated that he had a spot on his stomach that he suspected was ringworm. The next day plaintiff was seen by Amanda Womack. Nurse Womack instructed Plaintiff to apply cool compresses to the affected area and apply hydrocortisone twice daily. Nurse Womack also instructed plaintiff to return if the area was not better within seven to ten days.

Plaintiff submitted a HSR on March 28, 2016, in which he continued to express concern about the spot on his stomach. Plaintiff stated his rash was spreading and caused him itching, irritation, and discomfort. Taylor met with plaintiff on March 30, 2016, in response to plaintiff's March 28, 2016 HSR. At the time of this consult, plaintiff had a dime-sized spot on his stomach, which was raised and red. Nurse Taylor noted the spot appeared to be tinea versicolor (fungal infection) and instructed plaintiff to monitor the area and follow up if his condition worsened.

Defendant Taylor saw plaintiff again on April 15, 2016, for plaintiff's complaint of dry skin. During this encounter, a referral was made to the nurse practitioner regarding plaintiff's dry skin, and plaintiff was given bacitracin packets.

On April 27, 2016, plaintiff filed another HSR for the rash on his stomach. Plaintiff was seen by defendant Taylor on April 29, 2016. Defendant Taylor sent an email to a nurse practitioner about

treatment for tinea versicolor, and the nurse practitioner stated tinea versicolor is considered cosmetic and that no treatment is needed. Tinea versicolor is a different type of fungal infection than ringworm. Plaintiff did not complain of dry skin on the HSR dated April 27, 2016. Defendant Taylor had no further contact with plaintiff after April 29, 2016.

On May 16, 2016, plaintiff was released to the general population and was able to purchase lotion for his dry skin. After plaintiff was moved from administrative segregation to general population, defendant Taylor was no longer responsible for providing him with medical care.

On July 21, 2016, Shannon Oaks diagnosed plaintiff with tinea corporis, which is the scientific term for ringworm. Plaintiff's infected spot on his stomach eventually grew from approximately the size of a dime to the size of a half dollar. Later plaintiff's ringworm infection also spread to his sides, his eyelid and his groin, which caused him itching, irritation, and discomfort. Plaintiff received treatment for ringworm and the condition was resolved.

## IV. Discussion

### A. Count I - Deprivation of Due Process Rights

In Count I of his Amended Complaint, plaintiff alleges defendants Dormire, Russell, and Steele deprived him of his due process rights by holding plaintiff in prolonged administrative segregation without meaningful review in violation of the Fourteenth Amendment of the U.S. Constitution.[5] Plaintiff alleges that while the classification committee held periodic review hearings,

---

[5]Plaintiff does not challenge his initial assignment to single-cell administrative segregation, but rather that he was held in single-cell administrative confinement for so long without meaningful review. As the Court found in its initial frivolity review, a challenge to plaintiff's initial assignment to single-cell administrative segregation would be futile as it was reasonable that prison officials would assign plaintiff to single-cell confinement after he recently murdered his cellmate. Doc. 9 at 5.

the hearings were merely pretextual, and defendants did not consider plaintiff's continued good behavior or give meaningful scrutiny to the necessity of retaining him in administrative segregation.

In the prison context, the Due Process Clause "does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner." Sandin v. Conner, 515 U.S. 472, 478 (1995) (citing Meachum v. Fano, 427 U.S. 215, 222 (1976)). Prisoners "do[ ] not shed [their] basic constitutional rights at the prison gate," Wolff v. McDonnell, 418 U.S. 539, 581 (1974), but "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" Jones v. N. Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 126 (1977) (quoting Price v. Johnston, 334 U.S. 266, 285 (1948)). "[T]he constitutional rights of prison inmates are legitimately curtailed as a result of their convictions for criminal offenses." Wycoff v. Nichols, 94 F.3d 1187, 1190 (8th Cir. 1996).

Due process claims challenging assignment to administrative segregation involve a two-step inquiry. Williams v. Hobbs, 662 F.3d 994, 1000 (8th Cir. 2011). A plaintiff must show he was "deprived of life, liberty, or property by government action," id. (quoting Orr v. Larkins, 610 F.3d 1032, 1034 (8th Cir. 2010)(per curiam)), by establishing that the segregation created an "atypical and significant hardship on him in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484. The determination whether conditions of confinement imposed an atypical and significant hardship is typically a question of fact. Portley-El v. Brill, 288 F.3d 1063, 1065 (8th Cir. 2002). Once an inmate has established deprivation of a liberty interest, the Court "must next determine what process is necessary to protect that interest." Williams, 662 F.3d at 1000 (quoting Clark v. Brewer, 776 F.2d 226, 232 (8th Cir. 1985)).

In its initial review, pursuant to 28 U.S.C. § 1915(e), the Court found plaintiff had pleaded facts sufficient to show "that his continued segregation for 923 days implicates a liberty interest." Doc. 9 at 4. Plaintiff asserts in his response to defendants' motion for summary judgment that discovery has confirmed there are issues of fact as to whether plaintiff's prolonged confinement in administrative segregation imposed an atypical and significant hardship sufficient to implicate the Due Process Clause. Plaintiff, however, does not articulate in his memorandum how his confinement imposed an atypical and significant hardship on him.

The Eighth Circuit has instructed that "[i]n order to determine whether an inmate possesses a liberty interest, we compare the conditions to which the inmate was exposed in segregation with those he or she could 'expect to experience as an ordinary incident of prison life.'" Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003) (quoting Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997)). Neither plaintiff nor defendants provided the Court with specific factual comparisons among single-cell administrative segregation, double-cell administrative segregation, and the general population at ERDCC. Plaintiff complained in his IRR that while in administrative segregation, he lost the benefits of using the phone when he wanted, getting regular canteen and contact visits, and going out to the yard. And in plaintiff's Additional Material Facts in Opposition to Motion for Summary Judgment, plaintiff cites to ERDCC's Administrative Segregation Regulations and asserts there were "restrictions placed on inmate's attire, access to hygiene products, canteen access, personal property, telephone usage, and recreation that did not apply to inmates in general population." Doc. 64 at 20. Plaintiff, however, provides no specifics as what these restrictions were and how they were applied him, and he fails to explain how they were different than the restrictions placed on those in the general prison population.

What is more, some of the restrictions listed in plaintiff's IRR do not implicate due process rights. A prisoner does not have a liberty interest in contact visitations. <u>Phillips</u>, 320 F.3d at 847. A prisoner may have a liberty interest in some access to exercise, but the Eighth Circuit has not established how often prisoners must be allowed to exercise, and plaintiff presented no evidence that he was denied access to any exercise. <u>Id.</u> Limitations on dining and canteen, among other things, "do not present the 'type of atypical, significant deprivations in which a state might conceivably create a liberty interest.'" <u>Christianson v. Clarke</u>, 932 F. Supp. 1178, 1183 (D. Neb. 1996) (quoting <u>Sandin</u>, 515 U.S. at 478); <u>see also Oliver v. Greenwell</u>, 2005 WL 2406015, at *3 (E.D. Mo. Sept. 29, 2005) (finding no constitutionally protected interest in canteen privileges).

That said, "[t]he length of time of a prisoner's segregation is a significant factor in the determination of whether the confinement is an 'atypical and significant hardship.'" <u>Herron v. Wright</u>, 1997 WL 292333, at *1 (8th Cir. 1997) (unpublished per curiam) (quoting <u>Sandin</u>, 515 U.S. at 484) (finding ten years of administrative segregation "appears to be beyond typical and insignificant," and remanding to district court for further factual findings). The Eighth Circuit has found that multiple years of administrative segregation might impinge on a liberty interest requiring due process. <u>Id.</u> <u>See also Williams v. Norris</u>, 277 F. App'x 647, 650 (8th Cir. 2008) (unpublished per curiam) (twelve-year administrative segregation confinement deprived prisoner of protected liberty interest); <u>Herron v. Schriro</u>, 11 F. App'x 659, 661–62 (8th Cir. 2001) (unpublished per curiam) (more than thirteen years in administrative segregation resulted in atypical hardship in relation to ordinary incidents of prison life, and defendants could not continue to deprive inmate of general population status without affording him due process); <u>Chestang v. Varner Super Max</u>, 496 F. App'x 684, 686 (8th Cir. 2013) (unpublished per curiam) (allegation of continued segregation for

four years without meaningful periodic reviews, in retaliation for an altercation with a prison officer, implicated a liberty interest); but see Ballinger v. Cedar Cty., Mo., 810 F.3d 557, 563 (8th Cir. 2016) (being held in solitary confinement for one year after state granted initial habeas relief did not deprive plaintiff of a liberty interest); Orr v. Larkins, 610 F.3d at 1032 (nine-month stay in administrative segregation for "dirty urine" did not constitute an atypical and significant hardship); Hemphill v. Delo, 124 F.3d 208 (8th Cir. 1997) (four days locked in his housing unit, thirty days in disciplinary segregation, and approximately 290 days in administrative segregation for dealing drugs did not deprive plaintiff of liberty interest); cf. Rahman X v. Morgan, 300 F.3d 970, 973–74 (8th Cir. 2002) (finding no liberty interest because while plaintiff was kept in a segregation cell for twenty-six months, he was not subject to the hardships that other prisoners faced).

The amount of time plaintiff in this case was held in administrative segregation was significantly shorter than the cases discussed above where a liberty interest was found. Nonetheless, for purposes of summary judgment, the Court assumes without deciding that plaintiff has established his placement in administrative segregation for 923 days created an atypical and significant hardship on him in relation to the ordinary incidents of prison deprivation, sufficient to rise to the necessary level that it impinged on a liberty interest protected by the Constitution. See Sandin, 515 U.S. at 484.

As for what process plaintiff was due, the Eighth Circuit has explained that "where an inmate is held in segregation for a prolonged or indefinite period of time, due process requires that his situation be reviewed periodically in a meaningful way and by relevant standards to determine whether he should be retained in segregation or returned to population." Kelly v. Brewer, 525 F.2d 394, 400 (8th Cir. 1975). More recently, in Williams v. Norris, where the plaintiff had been held

in administrative segregation for his own protection for over twelve years, the Eighth Circuit found that "for an ad seg inmate, the Constitution requires no more than the process [the plaintiff] received—reviews at 60–day intervals at which [plaintiff] could make statements and present evidence, and annual meetings with a warden—provided such reviews were meaningful." 277 F. App'x at 650.

Here, it is undisputed that plaintiff was held in administrative segregation for a little over two and a half years, and his assignment to administrative segregation was periodically reviewed to determine whether he should remain in administrative segregation or be returned to the general population. From the time he was assigned to administrative segregation to when he was released, ERDCC held thirteen hearings, at which plaintiff was provided the opportunity to make statements and argue in favor of transfer to the general population. Therefore, the issue before the Court is whether the reviews were meaningful.

Citing to Williams v. Hobbs, 662 F.3d 994, plaintiff contends that ERDCC's reviews were not meaningful because the review hearings were short, sometimes less than five minutes. He also points to the fact that, like the defendants in Williams, the ERDCC classification committee failed to provide detailed reasons for keeping plaintiff in single-cell administrative segregation, and did not explain what evidence about his demeanor or behavior supported its conclusions that plaintiff continued to be a security risk. Plaintiff complains there is no evidence that the committee considered evidence of plaintiff's good behavior or acceptable institutional adjustment as part of its decision. Plaintiff also cites to the fact that at least one member of the committee admitted they did not have the authority to release plaintiff without approval from defendant Dormire or a Deputy Director.

The Court agrees with plaintiff that some of the factors the Eighth Circuit relied upon in Williams to find Mr. Williams's administrative segregation reviews were not meaningful are present here. However, there are significant differences between Williams and the case at bar. Most significantly, the plaintiff in Williams was housed in administrative segregation *for fourteen years*. 662 F.3d at 997. Here, plaintiff was in administrative segregation for approximately two years and seven months. It is also significant to note that one year after starting his prison sentence, the plaintiff in Williams murdered a fellow inmate, for which he was placed in segregated confinement for over one and a half years. The plaintiff did not challenge this confinement, and the constitutionality of the assignment and continued confinement for murdering a cellmate was not at issue in the case. Subsequent to Mr. Williams's release from administrative segregation for murdering an inmate, he was transferred to a maximum security prison, in which he served his time without major incident. Id. at 997. More than ten years later, Mr. Williams was attacked performing his duties in the prison's kitchen. Thereafter, he was assigned to administrative segregation for nearly fourteen years, ostensibly for his own protection. Id.

The cases are not analogous. Here, plaintiff, who is in prison because he murdered his son by strangulation, was assigned to administrative segregation for strangling his cellmate, not for his own protection. Plaintiff was assigned to administrative segregation to protect the safety of other inmates. Morever, the time Mr. Williams spent in administrative segregation was significantly longer – more than five times as many years – and there was no due process review for much of the time he spent there. Mr. Williams did not challenge the first time he was assigned to administrative segregation for murdering an inmate. As for the second time he was assigned to segregation, the Eighth Circuit did not even review the first three years of Mr. Williams's fourteen-year assignment,

a longer period of time than plaintiff in the present case was in segregation. The Court only considered whether the reviews were meaningful from 1999 onward. Id. at 1001.

As the Eighth Circuit stated in Kelly, "[W]hat would be required for an intelligent and meaningful review of the case of one inmate might not be required in the case of another." 525 F.2d at 400. In the Court's view, the review process in Williams was subjected to stricter scrutiny than what is required here because the plaintiff in that case had been held in administrative segregation for such a long period. Furthermore, Mr. Williams was not being held in administrative segregation because he posed a risk to guards and other inmates, as was plaintiff in this case, but ostensibly for his own protection, to which he objected.

Defendants in the case at bar were tasked with trying to predict plaintiff's future behavior based not only on his conduct while in administrative segregation, but also on his conduct and the behavior that led up to his placement in administrative segregation. Defendant Dormire testified that plaintiff was held in single-cell administrative segregation, and later double-cell administrative segregation, because just prior to his transfer to ERDCC he had manually strangled his cellmate in the county jail, and Dormire believed that releasing plaintiff to the general population would create a danger to the safety and security of the institution. According to Dormire and Steele, MDOC inmates who have murdered a fellow cell-mate while incarcerated are generally placed in single-cell administrative segregation for three to five years, and sometimes longer.

Plaintiff argues that his criminal history, and more specifically the fact that he strangled his cellmate, does not relieve defendants of their obligation to provide him with meaningful review. Citing to Kelly, plaintiff argues that on's criminal history cannot be considered "determining or preponderant guidelines in deciding whether or not [prisoners] can be safely returned to population."

525 F.2d at 396.  While criminal history should not be dispositive of the decision to hold an inmate

in administrative segregation, it certainly can be taken into consideration and be given significant

weight.  Id.  Defendants considered plaintiff's criminal history, but it is also undisputed they took

into account that plaintiff was often uncooperative and refused to participate in the review process,

for whatever reason, and that some of the staff, including medical staff, considered him dangerous

despite the fact that he did not display outward aggression.

Plaintiff also criticizes defendants for failing to take into account his good behavior.  There

is nothing in the record to suggest that defendants did not consider the fact that plaintiff had a good

conduct record in administrative segregation.  It is undisputed that plaintiff received regular review

hearings, at which it was noted that plaintiff had good conduct.  The uncontroverted evidence also

shows that after each review hearing a report and recommendation was sent to defendants Kempker,

Dormire, or Steele, all of which noted plaintiff's good conduct.  Defendants then reviewed and acted

upon these reports in deciding whether and when to release plaintiff.  Plaintiff's good behavior was

outweighed by his past conduct, however, until such time that defendants believed it was safe to

return plaintiff to the general population.

The Supreme Court has instructed district courts to afford appropriate deference and

flexibility to state prison officials, who are trying to manage a volatile environment.  Wolff, 418 U.S.

at 561–63.  According to the Eighth Circuit, "in view of the nature of the problems involved the

ultimate decision in a given case must be left to the informed judgment, including discretionary

judgment, of prison administrators, subject to review by their own superiors and ultimately by the

courts in proper cases."  Kelly, 525 F.2d at 400.  In making such decisions, wardens may properly

consider "the underlying acts of the [inmates] and the fact of their convictions as historical facts of

their cases and as factors to be considered, among others, in determining whether after a lapse of months or even of years it is safe to terminate their segregated status." Id. at 402.

The uncontroverted evidence shows that plaintiff received timely reviews, at which he was given the opportunity to make statements, but he remained in administrative segregation because defendants believed plaintiff might harm someone if he were to be released to the general population. This belief was based on plaintiff's past conduct, reports from the classification committee, plaintiff's conduct at review hearings, and statements from staff, including medical professionals. The Court cannot find that this belief was unreasonable or unsupported by the facts. Plaintiff's reviews were meaningful, in that defendants considered proper factors and made informed, albeit discretionary judgments, that plaintiff remained a security risk until the date he was released. To the extent plaintiff's placement in administrative segregation for 923 days implicated a liberty interest, the Court concludes plaintiff received sufficient due process with respect to his continued assigned to administrative segregation. See Rahman X, 300 F.3d at 974 (finding adequate due process where the plaintiff received review hearings every sixty days, at which he was given the opportunity to address the committee).

The Court finds there are no genuine issues of material fact and concludes that defendants Dormire, Russell, and Steele have established they are entitled to summary judgment as a matter of law on plaintiff's claim of deprivation of due process rights. As a result, the Court does not reach defendants' argument that they are entitled to summary judgment based on qualified immunity.

**B.      Count II - Deprivation of Constitutional Right to be Free of Cruel and Unusual Punishment**

In Count II of his Amended Complaint, plaintiff alleges defendants Phillips and Taylor violated his constitutional rights to be free from cruel and unusual punishment in that they denied

plaintiff adequate hygiene supplies and medical care. Plaintiff alleges defendant Phillips failed to provided him with lotion, and defendant Taylor failed to treat his dry skin and a ringworm rash.

### 1.        Lotion as a hygiene supply - defendant Phillips[6]

In order to succeed on an Eighth Amendment claim, a prison inmate must show that he was subjected to the "unnecessary and wanton infliction of pain." Wilson v. Seiter, 501 U.S. 294, 297 (1991). This constitutional guarantee does not protect against "mere acts of negligence." Givens v. Jones, 900 F.2d 1229, 1232 (8th Cir. 1990). Punishment is cruel and unusual if it deprives inmates of the minimal civilized measure of life's necessities. Whitnack v. Douglas County, 16 F.3d 954, 957 (8th Cir. 1994) (citations and quotations omitted). While the Constitution does not mandate comfortable prisons, inmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy period of time. Id. "Conditions of confinement, however, constitute cruel and unusual punishment 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" Id. (quoting Wilson, 501 U.S. at 304); Tokar v. Armontrout, 97 F.3d 1078, 1082 (8th Cir. 1996). Further, for a constitutional violation of the Eighth Amendment to occur, a prison official must have a "sufficiently culpable state of mind." Wilson, 501 U.S. at 297. To be sufficiently culpable, the officer must have acted, subjectively, with deliberate indifference to inmate health or safety. See Wilson, 501 U.S. at 302-03; Estelle v. Gamble, 429 U.S. 97, 106 (1976).

Defendant Phillips argues that case law does not support plaintiff's assertion that he was entitled to lotion for dry skin. The Court agrees. Plaintiff does not cite to and the Court did not find

---

[6]Plaintiff's claim against defendant Phillips is not for the denial of medical care – it is undisputed plaintiff was allowed to see medical staff about his dry skin – but rather plaintiff claims that defendant Phillips denied him access to lotion as a hygiene supply.

controlling case law holding that an inmate is entitled to lotion as a personal hygiene product required under the Constitution.

The cases plaintiff cites in his opposition brief are distinguishable from the case at bar in that the prison conditions at issue in these cases were more deplorable and unhygienic, or they involved indifference to a serious medical condition. See Cincoski v. Richard, 418 F. App'x 571, at *1 (8th Cir. 2011) (inmate held on suicide watch was denied medication, shoes, clothes, underwear, or blankets; his cell was flooded and freezing; and he was fed gruel. He was strapped in a restraint chair and asphyxiated; and denied personal hygiene items, which caused him to develop canker sores, bleeding, and extreme pain for which medication was denied."); Schaub v. VonWald, 638 F.3d 905, 915 (8th Cir. 2011) (paraplegic inmate in detention facility's work-release program had "oozing sores and the smell of infection"); Myers v. Hundley, 101 F.3d 542, 544 (8th Cir. 1996) (finding plaintiffs could show they were denied access to the courts where idle pay was too low to cover the cost of stamps, as well as toothpaste and soap); Howard v. Adkison, 887 F.2d 134, 137 (8th Cir. 1989) (inmate's cell and mattress were covered in human waste, and clothes were not laundered for over five months).

The Eighth Circuit has held that a prisoner's inability to purchase body lotion, among other items, does not state a claim for cruel and unusual punishment, because discomfort does not amount to cruel and unusual punishment. Buckley v. Barlow, 997 F.2d 494, 496 (8th Cir. 1993) ("We also conclude that [plaintiff]'s allegations that he was denied certain personal hygiene items were insufficient to state a claim for cruel and unusual punishment."). Under the facts of this case, the Court finds defendant Phillips's refusal to provide plaintiff with lotion does not rise to the level of

a constitutional violation under the Eighth Amendment. Defendant Phillips is entitled to summary judgment as a matter of law.

## 2. Deliberate indifference to plaintiff's medical conditions - defendant Taylor

Plaintiff's claims against defendant Taylor are for deliberate indifference to his medical condition, specifically dry skin and a ringworm infection. Defendant Taylor was a nurse who treated plaintiff while he was in administrative segregation. Defendant Taylor was not the only nurse who saw plaintiff for his medical needs. Plaintiff claims defendant Taylor deliberately ignored his dry skin and ringworm in violation of the Eighth Amendment to the United States Constitution.

Deliberate indifference to the serious medical needs of prisoners constitutes an "unnecessary and wanton infliction of pain" which is proscribed by the Eighth Amendment. See Estelle, 429 U.S. at 105. Delaying access to medical care or intentionally interfering with prescribed treatment can constitute deliberate indifference. Id. at 104-05. A medical need is serious only if it is diagnosed by a physician as requiring treatment, or is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Aswegan v. Henry, 49 F.3d 461, 464 (8th Cir. 1995) (quoting Johnson v. Busby, 953 F.2d 349, 351 (8th Cir. 1991)). It is a violation of the Eighth Amendment to deny medical care for serious medical needs when the denial results in pain and suffering that serves no penological purpose. Estelle, 429 U.S. at 103.

To prevail on an Eighth Amendment claim, a plaintiff must establish two elements: "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" Farmer v. Brennan, 511 U.S. 825, 834 (1994) (quoting Wilson, 501 U.S. at 298). Second, plaintiff must prove that the defendant acted, subjectively, with deliberate indifference to his serious medical needs. Id.; see Estelle, 429 U.S. at 106. A prison official exhibits deliberate indifference when the official actually "knows of

and disregards" a prisoner's serious medical needs.  <u>Farmer</u>, 511 U.S. at 837; <u>Boyd v. Knox</u>, 47

F.3d 966, 968 (8th Cir. 1995).  "[T]he official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

<u>Farmer</u>, 511 U.S. at 837.  Disagreement with a medical judgment is not sufficient to state a claim

for deliberate indifference to medical needs. <u>Davis v. Hall</u>, 992 F.2d 151, 153 (8th Cir. 1993).

### a.      Plaintiff's dry skin

With regard to plaintiff's dry skin, there is no evidence in the record that a physician

diagnosed plaintiff with a medical condition requiring treatment. Therefore, the issue before the

Court is whether plaintiff's dry skin was so severe that it would have been obvious, even to a

layperson, that plaintiff required the attention of a doctor.  <u>Aswegan,</u> 49 F.3d at 464.

There is little evidence in the record before the Court as to the seriousness of plaintiff's dry

skin.  There are no photographs or other visual evidence.  In the medical records there is mention

of dry skin, redness, and scattered pinholes from scratching, and when plaintiff was seen on

February 9, 2016, plaintiff had red skin on his left wrist and two open areas on his right hand.

Plaintiff also testified that in January 20, 2016, his skin was so dry it was cracking open and

bleeding. There are, however, no other specifics, such as the size of the cracks or wounds, how

severe was the bleeding, or how long this condition lasted.  Plaintiff states that he was concerned

about contracting Hepatitis C through his sores, but there is no evidence this would have been

possible, and no evidence that plaintiff developed any sort of infection as a result of his dry skin.

In the Court's view, plaintiff has not presented adequate evidence that his dry skin was a

serious medical condition.  Viewing the evidence in a light most favorable to plaintiff, dry skin in

the winter that results in cracking and bleeding for a period of time does not rise to the level of a

serious medical condition such that a layperson would recognize the inmate required the attention of a medical doctor. Bell v. Hakala, 2011 WL 2671826, at *6 (E.D. Mo. July 8, 2011) (finding plaintiff had not established his dry skin condition was a serous medical need). Compare Applewhite-Bey v. Tripoli, 2007 WL 892566, at *6 (D. Minn. Mar. 21, 2007), aff'd, 283 F. App'x 426 (8th Cir. 2008) (finding plaintiff established he had a serious medical condition, as it was undisputed that a doctor had diagnosed plaintiff with ichthyosis, a genetic skin disorder characterized by dry scaly skin).

Even if the Court were to conclude that plaintiff's dry skin rose to the level of a serious medical condition, there is no evidence in the record that defendant Taylor disregarded it. Defendant Taylor treated plaintiff for dry skin on January 20, February 9 and 25, and April 15, 2016. On each of these occasions, he instructed plaintiff to stay hydrated by drinking eight to ten cups of water a day, to shower no more than once a day, to avoid hot water, and to use soap on the axilla and inguinal areas only. On three of the four occasions, defendant Taylor provided plaintiff with multiple packs of bacitracin ointment, which plaintiff admits helped alleviate his symptoms. Plaintiff may disagree with defendant's treatment plan, but disagreement with a medical judgment is not sufficient to state a claim for deliberate indifference to medical needs. Davis, 992 F.2d at 153 (deliberate indifference not established when medical staff does not implement a prisoner's requested course of treatment); Dulany v. Carnahan, 132 F.3d 1234, 1241 (8th Cir. 1997) ("[prisoner's] own disagreement with the frequency of monitoring her blood levels does not create a question of deliberate indifference as it does not indicate an 'unnecessary and wanton infliction of pain' or treatment that is 'repugnant to the conscience of mankind'") (quoting Estelle, 492 U.S. at 106); Kayser v. Caspari, 16 F.3d 280, 281 (8th Cir. 1994) (disagreement with the course of

medical treatment does not constitute a claim of deliberate indifference); <u>Warren v. Fanning</u>, 950 F.2d 1370, 1373 (8th Cir. 1991) (same). Plaintiff has not established that his dry skin was a serious medical condition, or that defendant Taylor deliberately disregarded it.

### b. Plaintiff's ringworm

With regard to plaintiff's ringworm rash, it is undisputed that plaintiff was seen by defendant Taylor for a small rash on his stomach on two occasions, on March 28 and April 29, 2016.[7] Defendant Taylor noted in the medical records that the spot, which was the size of a coin, appeared to be tinea versicolor, a fungal infection. On both occasions, defendant Taylor told plaintiff to monitor the rash and return for a follow up if the condition worsened, which plaintiff later did. While defendant Taylor was incorrect, and the rash was later diagnosed by a nurse practitioner to be tinea corporis – ringworm – plaintiff's claim against defendant Taylor with regard to his ringworm fails as a matter of law because plaintiff has not established that it was a serious medical condition.

In the record before the Court, plaintiff presented no medical evidence that his ringworm rash was a serious medical condition that required the attention of a medical doctor. As for whether it would have been obvious to a layperson that plaintiff required medical attention, during the two times plaintiff was seen by defendant Taylor, the rash on plaintiff's stomach was the size of a coin. The Court cannot conclude that a layperson would easily recognize that a small, coin-sized rash required a doctor's medical attention. <u>Aswegan</u>, 49 F.3d at 464. The Court finds that on the two

---

[7]Plaintiff first submitted an HSR complaining of a small, round rash on his stomach on March 10, 2016. Nurse Womack responded to the HSR and instructed plaintiff to apply cold compresses and hydrocortisone cream to the area.

occasions plaintiff saw defendant Taylor for the small rash on his stomach, the ringworm was not a serious medical condition.[8]

In any event, plaintiff cannot establish constitutional deliberate indifference on the part of defendant Taylor. At most, defendant Taylor misidentified a small rash, and proper treatment was delayed by a few weeks. Perhaps the misidentification was negligent, but it hardly rises to the requisite level the "unnecessary and wanton infliction of pain." Estelle, 492 U.S. at 106; Dulany, 132 F.3d at 1239 (the mere negligence, or medical malpractice, of a prison doctor is insufficient to give rise to a constitutional violation). Plaintiff has not established that defendant Taylor committed acts or made omissions sufficiently harmful to amount to deliberate indifference to a serious medical need. Id.

### *V. Conclusion*

In sum, the Court finds plaintiff has failed to establish that defendants Dormire, Russell, and Steele did not provide plaintiff with constitutional due process as to his continued assignment to administrative segregation. As for defendant Phillips, plaintiff has not shown that lotion is a hygiene product to which he was entitled under the Eighth Amendment. Finally, with regard to defendant Taylor, there is no evidence that plaintiff suffered from a serious medical condition, or that defendant Taylor deliberately disregarded any such condition.

---

[8]There is evidence in the record that later in 2016, after plaintiff return to general population, the rash became more serious and spread to other parts of plaintiff's body. But the issue before the Court is whether defendant Taylor deliberate ignored plaintiff's serious medical condition at the time he saw him. Plaintiff did eventually receive the appropriate medicine to treat ringworm, and the condition was resolved.

Accordingly,

**IT IS HEREBY ORDERED** that defendants Dave Dormire, Terry Russell, Troy Steele, and Dale Phillips's motion for summary judgment is **GRANTED**.  [Doc. 60]

**IT IS FURTHER ORDERED** that defendant Terry Taylor's motion for summary judgment is **GRANTED**.  [Doc. 68]

An appropriate judgment shall accompany this Memorandum and Order.


**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this  2nd  day of August, 2019.